Aleksandr Levchenko, *Pro Se*
Viktor Levchenko, *Pro Se*
124 Norfork Street
Brooklyn, New York 11235
646-719-9152



RECEIVED
APR 2 2 2010
PRO SE OFFICE

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT of NEW YORK

Viktor Levchenko,

Aleksandr Levchenko,

Plaintiff's's

vs

MERS, [Mortgage Electronic Registration Systems];Anthony Mazillo, James Johnson,  DEUTSCHE NATIONAL  TRUST COMPANY as Trustee for American Home Mortgage Assets Trust 2006- Mortgage Backed Pass-Through Certificates, Series 2006-6; American Brokers Conduit, American Home Mortgage Servicing, Inc., American Home Mortgage Corp.,

Case No.:

# CV10- 1804
**COMPLAINT**
Demand for Jury Trial

## GARAUFIS, J.

## BLOOM, M.J.

American Home Mortgage Investment
   Corp.,
Invesco Ltd.,
Invesco Private Capital,
WL Ross,
WL Ross & Co., LLC,
First Liberty Abstract, LLC
FEIN, SUCH & Crane, LLP
V.S. Vilkhu, Esquire
National City Bank,
PNC Bank,
John Does, 1-9
                                    Defendant's

_____

## COMPLAINT

### Preliminary Statement

1.      On 22nd September 2006, Aleksandr Levchenko Plaintiff's, appearing *Pro Se*, re-financed the Mortgage on his home with Defendant's MERS [ Mortgage Electronic Registration Systems, hereinafter MERS ]; American Brokers Conduit; American Home Mortgage Corp.; American Home Mortgage Servicing, Inc., American Home Mortgage Investment Corp.; "sub-prime" lenders which have been the subject of substantial litigation throughout the United States.   A number of irregularities occurred in connection with Plaintiff's's transaction. However, the gravamen [ 71 Claims ] of the instant Complaint was the failure of American Brokers Conduit to provide Plaintiff's, Alex Levchenko, hereinafter ALevchenko, with two Notices of his Right to rescind the transaction, as required by the Truth in Lending Act, 15 U.S.C. §1601 *et seq.* ( the "Act" ) and 12 C.F.R. 226 ("Regulation Z").

2. As a result of this failure, ALevchenko was entitled to RESCIND the transaction up to the later of three days following the time they were given the Notices or 3 years from the date of the transaction. On 20th March 2009, when ALevchenko was advised his legal Rights, ALevchenko exercised this Right by notifying in writing Defendant, American Brokers Conduit, and, continued to exercise this Right by notifying in writing said Defendants three more times [ in retaliation have instituted foreclosure proceedings ] and, who were initially believed to be the current holder of the mortgage until receipt of the Complaint for Foreclosure. On 11th May 2009, ALevchenko exercised this Right by notifying in writing Defendant American Brokers Conduit. On 24th July 2009, ALevchenko exercised this Right by notifying in writing Defendant, American Brokers Conduit. On 21st December 2009, ALevchenko exercised this Right by notifying in writing Defendant's, American Brokers Conduit, MERS, Anthony Mazillo, James Johnson, and, through chain of ownership American Home Mortg. Corp., American Home Mortgage Servicing, Inc., American Home Mortgage Investment Corp., Invesco, Ltd., Invesco Private Capital, WL Ross, WL Ross & Co., LLC. All Defendant's failed to comply with their obligations under the Act to terminate the Security Interest in ALevchenko's home and return to him the monies he had paid in connection with the transaction, thus forcing ALevchenko to commence this litigation.

2. "The civil justice system is based on the principle that defendants will have an opportunity to be heard in court before a judgment and action to collect on a purported debt is taken against them. "It appears that nine out of ten New Yorkers who are sued in the Civil Court of the City of New York are being denied their right to be heard because of possibly

**illegal process serving practices."** *See Justice Disserved - A Preliminary Analysis of the Exceptionally Low Appearance Rate by Defendants in Lawsuits Filed in the Civil Court of the City of New York* - a ten year study.

3.    Alex Levchenko complains that the Process Serving Company which allegedly was hired to serve his Summons and Complaint used improper service wherein the State of New York - Supreme Court does not have proper "jurisdiction" to proceed with the Foreclosure lawsuit; and, requested a "traverse hearing" regarding violations pursuant to N.Y. C.P.L.R. § 308 (1) (2), et al.

In this Complaint, Plaintiff's's seek, *inter alia,* the Injunction of various foreclosure and eviction proceedings, for themselves, based on the Defendant's routine failure to comply with statutory prerequisites to foreclosure.  Plaintiff's's seek determination of the validity of foreclosure complaint  held in violation of statutory requirements, lien is unperfected, together with damages and other Relief.

3.    New York's foreclosure process has become an undisciplined and lawless rush to seize homes.  Many thousands of foreclosures are plainly void under Statute and settled New York case law.  Most borrowers never obtain accurate statutorily required notices, New York judgments are entered based on inaccurate recitations concerning ownership of the mortgage, and homes are resold without a proper chain of title.

4.    Plaintiff's's in this Matter seek relief for the Defendant's wrongful foreclosure practices for Defendant's have arrogantly failed/refused to demonstrate that they have legal Standing as Parties of Interest in Plaintiff's's property, including but not limited to improper use of Plaintiff's's identity, negligent and/or intentional misrepresentation of appraised fair market value upon which Plaintiff's was contractually bound to rely and factually entitled to rely, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations as Mortgagee or "Trustee" on the Deed, "Mortgage Brokers", "Loan Originators," "Loan Sellers", "Mortgage Aggregator," "Trustee of Pooled Assets", "Trustee or officers of Structure Investment Vehicle", "Investment Banker", "Trustee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-backed Certificates'", "Seller of 'Asset-Backed' Certificates (shares or bonds)", "Special Servicer" and Trustee, respectively, of certain mortgage loans pooled together in a trust fund.

5.    Plaintiff's's bring this action to secure redress from unlawful mortgage servicing practices engaged in by American Broker's Conduit and American Home Mortgage Servicing, Inc., hereinafter AHMSI.

6.    Plaintiff's's alleges violations of (i) the Truth in Lending Act, 15 U.S.C. §1601 *et seq.* ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226, (ii) the Real Estate Settlement Procedures Act, 12 U.S.C. §2601 *et seq.* ("RESPA"), and HUD implementing Regulation X. 24 CPR Part 3500, et seq.,   (iii) New York State Uniform Fraudulent Conveyance Act, New York Debtor and Credit Law sections 270 through 281 (2008) - Section 273-a, which addresses fraudulent conveyances by Defendant's to an action

and in Section 276-a which provides for the award of attorneys' fees in actions to set aside a conveyance made with actual intent to defraud; (iv) Articles 3 and Article 9 of the New York UCC; and, Article 9 of New York's Real Property Law; and  New York General Obligations Law Sections 5-701 and 15-501(2) and UCC Section 2-201; New York Statutes § 190; § 9 - 308 through 316, § 9-323; N.Y. State Tech. Law § 304; New York Debtor and Creditor Law § 273-a;

7.      In addition to seeking compensatory, consequential and other damages, Plaintiff's's seek declaratory relief as to what (if any) party, entity or individual or group thereof is the owner of the promissory note executed at the time of the loan closing, and whether the Deed [Mortgage] secures any obligation of the Plaintiff's, and a MANDATORY INJUNCTION requiring reconveyance of the subject property [ 124  Norfork Street, Brooklyn, New York 11235 ] to the Plaintiff's's or, in the Alternative a Final Judgment GRANTING Plaintiff's's QUIET TITLE in the subject property.

## JURISDICTION and VENUE

1.      The Court has Subject Matter Jurisdiction pursuant to  15 U.S.C. § 1640 and § 1635; 28 U.S.C. § 1331, § 1337; Civil Rights Act of 1866 and 1871; and, 42

U.S.C. § 1981, 1983, and 1988.   The Court has authority to enter a declaratory judgment pursuant to 28 U.S.C. § 2201.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

2.      Subject Matter jurisdiction and venue are proper in this Court on the grounds of Diversity under 28 U.S.C. §1332 inasmuch as the challenged actions are alleged to have been committed in this District, all Defendant's transact business in this District and all the Named Plaintiff's's reside in this District.

## **PARTIES**

1.      Plaintiff's's, Aleksandr and Viktor Levchenko, are natural persons, have been at all times material hereto residents of the State of New York, Kings County, who own their home located at 124 Norfork Street, Brooklyn, New York 11235, hereinafter referred to as the "Property".

2.      Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY as Trustee for American Home Mortgage Assets Trust 2006- Mortgage Backed Pass-Through Certificates,Series 2006-6 have its principal place of business at 4600 Regent Blvd., Suite 20, Irving, Texas  75063, is a foreign New York State banking corporation, duly licensed, organized and existing pursuant to the laws of this State, doing business in the State of New York.

3.    Defendant MERS, Mortgage Electronic Registration Systems, is a citizen of the State of Virginia with an address as 1818 Library Street, Suite 300, Reston, Virginia 20190 doing business in the State of New York.  However, the New York Corporation Commission lists no "Statutory Agent" with a physical address in the State of New York, for Defendant,MERS.

4.    Defendant's Anthony Mazillo, former CEO of AMHSI Mortgage, and James Johnson, and John Doe's 1-19 are unknown to Plaintiff's's.  Their capacities are unknown.  Plaintiff's's alleges that they are in some way involved in the actions complained of herein as either independent actors, or as agents or principals of the other named defendants.  Plaintiff's's will Amend this Complaint to allege their true identities, capacities and roles when they are ascertained.

## EXECUTION of the NOTE and DEED of TRUST

1.      On 22nd September 2006, Aleksandr Levchenko  purchased the subject Property by executing a Promissory Note for "(US $1,000,000.00s interest", hereinafter referred to as the "Note".                                    **See Exhibit A**

3.      In "Definition (B)" of the same Deed of Trust, Plaintiff's, Aleksandr Levchenko, is designated as the "Borrower".

4. In "Definition (C)" Defendant, MERS, is indicated as the purported "Lender" (loan originator) for the transaction.

**FACTS**

Summary of the Facts of this Case

1.      Plaintiff's is the nominal payor on the subject promissory Note. The Loan Seller is a financial institution that was paid a fee to pose as a residential mortgage lender, when in fact the source of loan funds and the actual lender (Investors in Certificates) and underwriter (Mortgage Aggregator and Investment Banker) were other parties whose identities and receipt of fees and profits were withheld from Plaintiff's at Closing and despite numerous requests continue to be withheld from Plaintiff's by the Defendants contrary to the requirements of Federal Law and applicable New York State Law.

2.      Unknown to Plaintiff's, the Loan Seller, acting as principal in its relationships with the "independent appraiser" of the property and the mortgage broker and mortgage originator, induced the Plaintiff's into a transaction that did not and could not meet normal underwriting standards for a residential mortgage. The Loan Seller posed as a conventional mortgage lender thus leading Plaintiff's to reasonably believe that the Loan Seller, the mortgage broker,

-10-

and the loan originator had an interest in the success( repayment of the loan) of the transaction that Plaintiff's was induced to believe was being executed at the time of the "closing" of the subject loan transaction.

3.      In fact, the Loan Seller, mortgage broker, appraiser, loan originator, title agent, escrow agent and Trustee on the Deed of Trust, had no financial stake (i.e., liability) in the transaction and no interest other than obtaining Plaintiff's's signature on a "loan" that could never be repaid, contrary to representations and assurances from the conspiring participants in this fraudulent scheme. In fact, the "Appraisal" was intentionally and knowingly inflated along with other loan data to justify the closing of the "loan transaction."

4.      Plaintiff's relied upon the due diligence of the apparent "Lender" (i.e., actually the Loan Seller) in executing the and accepting the closing documents. In fact, no "lender" was involved in the closing in the sense of an entity performing due diligence and evaluation pursuant to national standards for underwriting and evaluating risk of loaning money in a residential loan closing.

5.      Thus no bank or other financial institution actually performing under the standards, rules and regulations governing such institutions was the "lender" which is the basis for Plaintiff's's cause of action for usury, to wit: that the inflated appraisal added an undisclosed cost to the loan which when added to the other terms, disclosed and undisclosed, and amortized over the real expected life of the "loan" exceeds the limits set by the New York

State legislature for usury and is not subject to exemption because the presence of a financial institution in the transaction was a ruse in which the form of the transaction covered over and mislead the Plaintiff's as to the real parties in interest and the fees generated by the production of the subject "loan transaction."

6.      Their purpose was solely to collect fees, rebates, kickbacks and profits that were never disclosed to Plaintiff's and have only recently been discovered by Plaintiff's through consultation with experts in securitization of residential mortgage loans, and diligent research including the filings of some parties with the Securities and exchange Commission which disclose the normal manner of operating this fraudulent scheme.

7.      Plaintiff's has repeatedly requested and demanded compliance with Qualified Written Requests under Real Estate Settlement Procedures Act, the Truth in Lending Act, and other applicable state and Federal Statutes which the Defendants have either ignored or refused to acknowledge or refused to resolve, copies of which demands are attached hereto as Exhibits. and incorporated herein.                                **See Exhibits C**

8.      Plaintiff's's and other professionals hired by Plaintiff's have conducted interviews with witnesses and have personally observed the practices and facts alleged herein. Besides the obvious theft of identity which lies at the core of the pattern of conduct defining the Defendants' illegal and fraudulent scheme, it is observably obvious that the property was appraised improperly, never verified despite "stringent" underwriting standards imposed by Government Sponsored Entities (interim investors) with which the Defendants purported to

comply (and did not) to wit: the appraisal report attached hereto and incorporated herein clearly shows the fair market value of the site (without improvements) quadrupling in less than 24 months and then returning to original value within 6 months after the closing of the "loan" transaction.

**See Exhibit D**

9.     Further, no less than three legal persons apparently claim to have performed the appraisal only two of which are shown to have received compensation and one of which is already admitted as merely being a pass-through vehicle of American Brokers Conduit by which American Brokers Conduit could claim, but not earn, additional undisclosed fees. Upon information and belief Defendant _____may have performed the only review for appraisal services although the appraisal report was apparently produced by Defendant _____ for a fee of $__0 onto which the stamped signature of Defendant _____ appears. _____ does not claim to be an employee of _____ and is believed by Plaintiff's to be an "independent contractor". The settlement statement also reports an appraisal fee to Defendant _____, which is a vehicle through which _____ improperly charges borrowers undisclosed fees and does not perform any work whatsoever.

**SEE EXHIBIT E**

10.     The Loan Seller was named as the Payee on the subject promissory note and the beneficiary under the mortgage terms allegedly securing the performance under the subject note. The "Trustee" was named as the Trustee on the Deed  executed at the time of the alleged "closing" of the "loan transaction." In accordance with New York State law, the Deed

and terms of security were recorded in the Kings County records.

11.   Notwithstanding the above, and without the knowledge of the Plaintiff's, the Loan Seller had entered into Assignment and Assumption Agreements with one or more parties and Pooling and Service Agreements with one or more parties including but not limited to the mortgage aggregator prior to or contemporaneously with the "Closing" of the subject "loan transaction."

14.1. Under the terms of these agreements, the Loan Seller received a sum of money, usually on receiving an application for a loan equal to the gross amount of the loan sought by Plaintiff's plus a fee of 2.5% or more which was allocated to the subject loan transaction.

15.   Contrary to the documents presented before and during the "closing" of the "loan transaction" the Loan Seller was neither the source of funding nor the "Lender."

12.   Thus at the time of recording, the source of funding and the "Lender" was a different entity than the nominal mortgagee or beneficiary under the deed of trust and was neither named nor disclosed in any fashion.

13.   The security for the "loan" thus secured an obligation that had been paid in full by a third party. Said third party(ies) was acting as a financial institution or "Lender" without even having been chartered or registered to do so despite regulations to the contrary from laws and rules of New York State or Federal authorities and/or agencies.

-14-

14.    Some form of documentation represented by the Loan Seller to the Mortgage Aggregator was presented before or contemporaneously with the "closing" of the loan" transaction. The documentation included actual copies of the document presented at "Closing."

15.    In most cases it consisted of either forged blank notes or vague descriptions of the content of the notes that were placed into the pool of assets that would be "securitized."

16.    Plaintiff's has discovered numerous cases in which the "loan closing" either did not take place at all or included documentation substantially different than the original offer and acceptance and substantially different than what could have been reported to the Mortgage Aggregator prior to the "closing." Plaintiff's have discovered numerous cases in which foreclosure has proceeded despite the fact that no loan closing was ever consummated, no papers were ever signed, or the loans were properly rescinded properly under law.

17.    Plaintiff's do not know what version of documentation was presented to the Mortgage Aggregator, and if the Mortgage Aggregator took one or more varying descriptions of the alleged "loan documents" into more than one pool of assets which was eventually sold for the purpose of securitizing the assets of the pool which included the subject loan transaction either once or more than once. Plaintiff's have requested such information numerous times only to be met with complete silence and defiance or obfuscation from the Defendants.

**See Exhibit E**

18.    There is no assignment of the subject mortgage in the county records, but there is a non-recorded Pooling and Services" Agreement and a non-recorded Assignment and Assumption Agreement which appears to substitute the Trustee over the pooled assets for the nominal Trustee in the Deed.

**See Exhibit F**

19.    The powers of this second Trustee were in turn transferred to either a Trustee for a Special Investment Vehicle (which performed the accounting and reporting of the pool assets) or to an investment bank Collateral Debt Obligation manager whose department performed the accounting and reporting of the pool assets.

20.    The reporting of the pool assets consisted principally of descriptions of the notes "signed" by borrowers and limited descriptions of the general terms of the note such that the note appeared to be more valuable than the initial terms of payment by the "borrower."

21.    The note from the subject "loan transaction" was eventually allocated into a new corporation (Special Purpose Vehicle) formed for the express purpose of holding the pooled assets under certain terms.

22.    The terms included the allocation of payments from one note to pay any deficiency in payment of another note in unrelated "loan transactions" contrary to the terms of each such note which required payments to be allocated to the principal, interest, escrow and fees

-16-

associated with only that specific "loan transaction."

23.     Whether such "deficiency" was caused by the difference between the higher general terms of description of the note or the lower actual payment requirements from the "borrower" is not known, despite numerous requests for accounting and the refusal of Defendants to provide any such information.

**See Exhibit G**

24.     The Investment Banking firm allegedly arranged through payment for a false inflated appraisal of the certificates and/or issuer of the certificates that would be sold to investors in much the same way as it had procured the false appraisal of the property that "secured" the "loan transaction." In addition, insurance was purchased from proceeds of this transaction, credit default swaps were purchased from proceeds of this transaction, the investors investments were "oversold" to create a reserve pool from which the SPV could pay deficiencies in payments, and the SPV created cross-collateralization agreements and overcollateralization of the pool assets to assure payments to the investors, thus creating co-obligors on the payment stream due from the Plaintiff's on the subject "loan transaction."

25.     The pool assets, including the Plaintiff's's subject "loan transaction " were pledged completely to the owners of the "asset-backed securities." All the certificates were then transferred to a Seller who in turn sold the certificates in varying denominations, each of which had slightly different terms depending upon which segment of the pool (tranche) secured the investment.

26.    If there is a holder in due course of the Plaintiff's's note arising from the subject "loan transaction" it is the investors who purchased said securities (certificates). Some of said securities are held by the original purchaser thereof, others were sold at weekly auction markets, others were paid by re-sales of property that was "secured", others were paid from prepayments, others were paid by sale at full or partial price to the investment bank that originated the entire transaction, some of which might be held by the Federal Reserve as nonrecourse collateral, and others might have been paid by one or more of the insurance, credit default swaps, cross guarantees or cross collateralization of the segment of the pool that secured the relevant investor who owned certificates backed by a pool of assets that included the subject "loan transaction."

27.    It is doubtful that any of the Defendants have any knowledge or have made any effort to determine whether the putative holders in due course have been paid in whole or in part. It can only be said with certainty that these Defendants seek to enforce loan documents for which they have already been paid in full plus illegal fees for participating in an illegal scheme. These Defendants seek to add insult to injury by demanding ownership of the property in addition to the receipt of payment in full long before any delinquency or default even allegedly occurred.

28.    In order for these Defendants to maintain legal standing in connection with the subject loan transaction they are required to show the entire chain of title of the note and the entire chain of title of the mortgage. **They have refused to do this despite numerous**

-18-

**requests,** leading Plaintiff's to concluded that the Defendants cannot produce such evidence of a complete chain of title or are intentionally withholding the information that would show breaks in such chain.

29.    Plaintiff's are left in the position of being in this Complaint with ghosts. While these Defendants have informally offered or considered providing indemnification for any third party claims, the fact remains that any relief awarded these defendants, any standing allowed to these defendants would expose the Plaintiff's to multiple claims and suits from an unknown number of parties and entities that all claim, possibly correctly, to the holders in due course. Any grant of ac certificate of title to an entity other than Plaintiff's or the nominal mortgagee creates an incurable defect in title.

30.    There is no recording of any document in the county records which predates the Defendants' attempt to initiate foreclosure or which would authorize them to proceed.

# Significance of REMIC

31.    Mortgage backed Securities (MBS) Certificates are "pass through Certificates," where the Trust has elected to be treated as a Real Estate Mortgage Investment Conduit ("REMIC") to enjoy the tax exempt status allowed under 15 U.S.C. §§806A-G.

32. REMIC regulations impose very strict limitations as to the nature of the investments a REMIC trust may make (i.e. "permitted investments") and transactions which it may not undertake (i.e. "prohibited transactions").

33. Any violation of REMIC regulations has significant tax implications for the Trust, as well as all Certificate holders. For example, any income realized by the Trust from a "prohibited transaction" is taxed at 100%.

34. The REMIC regulations also provide that any entity that causes the REMIC regulations to be violated is liable to the Trust and the Certificate holders for the entire amount of the tax.

35. Only income from "qualified mortgages" and "permitted investments" may enter a REMIC trust.

36. A "qualified mortgage" is an obligation (i.e. mortgage) which is principally secured by an interest in real property which (1) was transferred to the Trust on the startup date, (2) was purchased by the REMIC Trust within 3 months after the startup date or (3) any qualified replacement mortgage.

37. Permitted investments are limited to:

Cash Flow Investments (i.e. temporary investment where the Trust holds

-20-

money it has received from qualified mortgages pending distribution to the Certificateholders);

38. Qualified Reserve Assets (i.e. any intangible property which is held for investment and is part of a reasonably required reserve to provide for full payment of expenses of the REMIC or amounts due on regular interests in the event of defaults on qualified mortgages or lower than expected returns on cash flow investments.

39. These investments are for very defined purposes and are to be passive in nature. They must be "reasonably required."

40 Liquidation Proceeds from "foreclosed property" which is acquired in connection with the default or imminent default of a "qualified mortgage" held by the Trust.

41. In order to maintain the REMIC status, the Trustee and the Servicers must ensure that the REMIC receives no income from any asset that is not a "Qualified Mortgage" or a "Permitted Investment." 26 U.S.C. § 806F(a)(2)(B).

42. Prohibited Transactions include the disposition of a qualified mortgage (except where the disposition is "incident to" the foreclosure, default, or imminent default of the mortgage); or the receipt of any income from an asset that is not a

-21-

Qualified Mortgage or a Permitted Investment. 26 U.S.C. § 860F(a)(2)(B).

43.    Prohibited Transactions are taxed in an amount 100% of the REMIC's net income from such prohibited transaction. 26 U.S.C. § 860F(a)(1).

44.    Contributions of any "property" - e.g., cash, mortgages, etc. - made to the REMIC are taxed at 100% of the contribution, except for the four following exceptions:

45.    Contributions to facilitate a "clean up call" (i.e. the redemption of a class of regular interest, when by reason of prior payments with respect to those interests the administrative costs associated with servicing that class outweigh the benefits of maintaining the class). Reg. § 1.860G-2(j)(1).

46.    Any cash payment in the nature of a guarantee, such as payments to the REMIC Any violation of REMIC regulations will defeat the privileged tax status and will subject the REMIC to 100% taxation, plus penalties and interest. These taxes and penalties are ultimately borne by the Certificate holders. under a surety bond, letter of credit or insurance policy.

47.    Any cash contribution during the three month period after the start-up day; and Any cash contribution to a qualified reserve fund made by a holder of a residual interest.

-22-

48.    On a monthly basis, the Investment Banking firm and/or its agents, servants or employees compiled, individually and in concert, oversaw and approved all the information contained in the Distribution Reports and electronically sent same to certain parties.

49.    Based upon research performed by experts on behalf of the Plaintiff's. the data regarding the number of bankruptcies, aggregate Special Servicing Fees, and aggregate Trust Fund Expenses was routinely incomplete, false, and/or misleading.

50.    Further said report intentionally obfuscated the illegal allocation of payments, the failure to disclose payments, and the effect on the alleged obligation of the Plaintiff's, to wit: despite numerous insurance products, credit default swaps, cross collateralization, over collateralization and polling at multiple levels, money received by some or all of these Defendants under the pretense of it being a "Mortgage Payment" was in fact retained, reserved, applied to non-performing loans to make them appear as though they were performing loans, or paid as fees to the enterprise Defendants described in this complaint.

51.    Based upon the failure of the Defendants to respond, Plaintiff's have every reason to believe that the party receiving the payments (American Home Mortgage Servicing, Inc., hereinafter AMHSI) is neither the holder in due course of the note nor the owner of any rights under the mortgage provisions of the deed of trust.

52.    Further, Plaintiff's have every reason to believe that their  payments are not being

forwarded to the holder in due course of the note nor to any other authorized party.

53.    Accordingly Plaintiff's are in jeopardy, to wit: the true holder in due course and potentially dozens or even thousands of third parties could come forward claiming an unsatisfied interest in the promissory note and may or may not be subject to Plaintiff's's various affirmative defenses and counterclaims.

54.    In fact, research has revealed that in various states, such security interests are being purchased by speculators who then seek to enforce said liability, preventing the Plaintiff's from claiming the most basic defense, to wit: payment exactly as required by the terms of the note which was cashed by the receiving party (AMHSI) apparently without authority to do so.

55.    Defendants have failed and refused to reveal the true source of funds for the alleged loan transaction, further preventing Plaintiff's's right of three-day rescission under the Truth in Lending Act because the real lender has not been revealed and therefore the Notice of Rescission by the Plaintiff's has no authorized addressee.

56.    The fact that the "loan" was table-funded without a disclosed source of funds and without disclosing tens of thousands of dollars in fees all contrary to the requirements of state and federal law was withheld from Plaintiff's by Defendants and continues to be withheld by them. But for the the expenditure of time, money and effort on research, Plaintiff's would not have discovered the various deceptions of the Defendants at the alleged

-24-

loan closing.

57.    Plaintiff's alleges the closing was an "alleged loan closing" because in fact it was part of an undisclosed hidden illegal scheme to issue unregulated securities (mortgage backed securities) based upon the negotiation of non-negotiable notes, the terms of which had been changed, altered, amended or modified AFTER the execution by the Plaintiff's.

58.    Defendants then purported to "negotiate" the note by adding terms which allowed the proceeds of the note to be allocated to the payment of the notes of other borrowers and adding co-obligors as aforesaid through insurance, guarantees, additional collateralization and reserves all of which were undisclosed, as aforesaid.

59.    The note was not negotiable because it was no longer an unconditional promise to pay by the original borrower. The terms had changed, adding conditions to payment that were inherent in the "securitization process" that Defendants fraudulently promoted.

60.    Said "negotiation" of Plaintiff's's note was in actuality the theft of their identity to hide the vast number of "toxic waste mortgages, notes and obligations that the enterprise defendants were selling up through their "securitization" chain.

61.    The result of this was that notes from other borrowers wherein there was virtually no possibility of performance were disguised as being of the same class as Plaintiff's's Note.

62.    These disguised notes carried interest rates sometimes as high as 16.5% which under disguise were then sold to unsuspecting investors as triple AAA investments providing the investor with approximately 6-8% return.

63.    By selling virtually worthless "negotiable" paper at par or in the case of of toxic waste paper, 2-5 times par, the enterprise defendant reaped profits in the hundreds of thousands of dollars on each such "transaction." for example, if the toxic waste paper would under cover of Plaintiff's's credit rating and identity was sold at an investment return of 6% and the mortgage note carried a principal balance of $1,000,000, the enterprise Defendants sold the "investment" certificates on that "loan" for approximately $1,940,000 and thus received $940,000 in illegal, fraudulent and undisclosed "profits" or "fees" in a $1,000,000 mortgage transaction.

64.    Thus the economics of mortgage origination changed, to wit: the worse the loan, the more money the enterprise defendants made as long as there were enough people, like Plaintiff's, whose identify was used to hide the high volume ( and high profit) of toxic waste loans.

65.    It was thus in the financial interest of the enterprise Defendants to create unrealistic and false market expectations, deceiving the public as a whole in specified geographical areas of the country that were identified by these enterprise Defendants as targets.

66.    Since these illegal profits were not disclosed, the Plaintiff's is entitled to an accounting and a pro rate share of the profits obtained by the illegal, improper and undisclosed use of her name, credit rating and identity.

67.    Based upon the opinion of Plaintiff's's experts, Plaintiff's's share of said profits would be in excess of $2 million.

68.    The Distribution Reports are supposed to accurately reflect the "financial health of the trust," and provide Certificate holders,with important data such as the number of loans in bankruptcy, the aggregate amount of special servicing fees, and the aggregate amounts of trust fund expenses. Each and every one of these categories is essential for to assess its profit and loss potential in the REMIC entity. Furthermore, this data is used by bond rating agencies to assess the value of the Certificates.

69.    Based upon the filings and information of the Plaintiff's it appears that no accurate accounting has ever been presented to anyone and that therefore the identity and status of any putative holder in due course is completely shrouded in secrecy enforced by these Defendants, their agents, servants and employees.

70.    Unreported repurchases of certificates or classes of certificates would and did result in a profit to the REMIC that went unreported, and which was not credited to Borrowers where the repurchase was, as was usually the case, the far less than the original investment.

-27-

71. While the Plaintiff's would never have entered into a transaction in which the true nature of this scheme was revealed, any profits, refunds, rebates, fees, points, costs or other income or gain should be credited on some basis to said borrowers including Plaintiff's herein.

## GENERAL ALLEGATIONS

1.      The end result of the false and misleading representations and material omissions of Defendants as to the true nature of the mortgage loan actually being processed, which said Defendants had actual knowledge was in direct conflict with the original Uniform Residential Loan Application, early TIL, and Plaintiff's' stated intentions and directions to the Defendants at the time of original application for the loan, fraudulently caused Plaintiff's to execute predatory loan documents.

2. At no time whatsoever did Defendants ever advise Plaintiff's (nor, as far as Plaintiff's can determine, any "investor" in certificates of mortgage-backed securities) that: the mortgage loan being processed was not in their best interest;

3. The terms of the mortgage loan being processed were less favorable than the fixed-rate loan which Defendants previously advised Plaintiff's that they qualified for;

4. That the mortgage loan was an inter-temporal transaction (transaction where terms, risks, or provisions at the commencement of the transaction differ at a later time) on which

-28-

Plaintiff's was providing cover for Defendants' illegal activities.

5.      That Plaintiff's would likely be placed in a position of default, foreclosure, and deficiency judgment regardless of whether she met her loan obligations once the true lender or true holder(s) in due course appeared;

6.      That the originating "lender", that being Defendant AMHSI and/or American Brokers Conduit and/or undisclosed third parties, had no intention of retaining ownership interest in the mortgage loan or fully servicing same and in fact may have and probable had already pre-sold the loan, prior to closing, to a third party mortgage aggregator pursuant to previously executed documentation (Assumption and assignment Agreement, Pooling Services Agreement, etc. all executed prior to Plaintiff's's "loan Closing."

7.      That the mortgage loan was actually intended to be repeatedly sold and assigned to multiple third parties, including one or more mortgage aggregators and investment bankers (including but not limited to Defendants DOES 1-10), for the ultimate purpose of bundling the Plaintiff's' mortgage with hundreds or perhaps thousands of others as part of a companion, support, or other tranche in connection with the creation of a REMIC security known as a Collateralized Mortgage Obligation ("CMO"), also known as a "mortgage-backed security" to be sold by a securities firm (and which in fact ended up as collateral for Asset-Backed Securities Certificates, created the same year as the closing);

-29-

8.    That the mortgage instrument and Promissory Note may be sold, transferred, or assigned separately to separate third parties so that the later "holder" of the Promissory Note may not be in privity with or have the legal right to foreclose in the event of default;

9.    That in connection with the multiple downline resale and assignment of the mortgage and Promissory Note that assignees or purchasers of the Note may make "pay-downs" against the Note which may effect the true amount owed by the Plaintiff's on the Note;

10.    That a successive assignee or purchaser of the Note and Mortgage may not, upon assignment or purchase, unilaterally impose property insurance requirements different from those imposed as a condition of the original loan (also known as prohibition against increased forced-placed coverage) without the Plaintiff's' prior notice and consent;

11. As a result of the closing and in connection therewith, Defendants placed the Plaintiff's into a pool of a sub-prime adjustable rate mortgage programs, with Defendants intentionally misleading Plaintiff's and the other borrowers and engaging in material omissions by failing to disclose to Plaintiff's and other borrowers the fact that the nature of the mortgage loan applications had been materially changed without Plaintiff's's knowledge or consent, and that Plaintiff's was being placed into a pool where the usual loan was an adjustable rate mortgage program despite borrowers not being fully qualified for such a program.

12.    Prior to the closing, Defendant American Brokers Conduit and/or undisclosed third

-30-

parties failed to provide to Plaintiff's the preliminary disclosures required by the Truth-In-Lending Act pursuant to 12 CFR (also known as and referred to herein as "Regulation Z) sec. 226.17 and 18, and failed to provide the preliminary disclosures required by the Real Estate Settlement Procedures Act ("RESPA") pursuant to 24 FR sec. 3500.6 and 35007, otherwise known as the GFE.

13.    Defendant American Brokers Conduit and/or undisclosed third parties also intentionally failed and/or refused to provide Plaintiff's with various disclosures which would indicate to the Plaintiff's that the consumer credit contract entered into was void, illegal, and predatory in nature due in part to the fact that the final TIL showed a "fixed rate" schedule of payments, but did not provide the proper disclosures of the actual contractually-due amounts and rates.

14.    Defendants failed and/or refused to provide a HUD-1 Settlement Statement at the closing which reflected the true cost of the consumer credit transaction. As Defendants failed to provide an accurate GFE or Itemization of Amount Financed ("IOAF"), there was no disclosure of a Yield Spread Premium ("YSP", which is required to be disclosed by the Truth-In-Lending Act) and thus no disclosure of the true cost of the loan.

15.    As a direct and proximate result of these failures to disclose as required by the Truth-In-Lending Act, Defendant MOTION received a YSP in a substantial amount of without preliminary disclosure, which is a *per se* violation of 12 CFR sec. 226.4(a), 226.17 and 18(d) and (c)(1)(iii). The YSP raised the interest rate which was completely unknown to or

-31-

approved by the Plaintiff's, as they did not received the required GFE or IOAF.

16.     In addition, the completely undisclosed YSP was not disclosed by Defendant in their broker contract, which contract was blank in the area as to fees to be paid to Defendant. This is an illegal kickback in violation of 12 USC sec. 2607 as well as New York State law which gives rise to all damages claims for all combined broker fees, costs, and attorneys' fees.

17.     The Amount Financed within the TIL is also understated which is a material violation of 12 CFR sec. 226.17 and 18, in addition to 15 USC sec. 1602(u), as the Amount Financed must be completely accurate with no tolerance.

18.     Defendants were under numerous legal obligations as fiduciaries and had the responsibility for overseeing the purported loan consummation to insure that the consummation was legal, proper, and that Plaintiff's received all legally required disclosures pursuant to the Truth-In-Lending Act and RESPA both before and after the closing.

19.     Plaintiff's, not being in the consumer lending, mortgage broker, or residential loan business, reasonably relied upon the Defendants to insure that the consumer credit transaction was legal, proper, and complied with all applicable laws, rules, and Regulations.

20.     At all times relevant hereto, Defendants regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written

agreement, is payable in more than four (4) installments and was initially payable to the person the subject of the transaction, rendering Defendants "creditors" within the meaning of the Truth-In-Lending Act, 15 U.S.C. sec. 1602(f) and Regulation Z sec. 226.2 (a)(17).

21.    At the closing of their subject "loan transaction", Plaintiff's executed Promissory Notes and Security Agreements in favor of Defendants as aforesaid. These transactions, designated by Defendants as a Loan, extended consumer credit which was subject to a finance charge and which was initially payable to the Defendants.

2.    As part of the consumer credit transaction the subject of the closing, Defendants retained a security interest in the subject property which was Plaintiff's' principal residential dwelling.

23.    Defendants engaged in a pattern and practice of defrauding Plaintiff's in that, during the entire life of the mortgage loan, Defendants failed to properly credit payments made; incorrectly calculated interest on the accounts; and have failed to accurately debit fees. At all times material,

24.    Defendants had actual knowledge that the Plaintiff's' accounts were not accurate but that Plaintiff's would make further payments based on Defendants' inaccurate accounts.

25.    Plaintiff's made payments based on the improper, inaccurate, and fraudulent

-33-

representations as to Plaintiff's' accounts.

26.    As a direct and proximate result of the actions of the Defendants set forth above, Plaintiff's overpaid in interest.

27.    Defendants also utilized amounts known to the Defendants to be inaccurate to determine the amount allegedly due and owing for purposes of foreclosure.

28.    Defendants' violations were all material in nature under the Truth-In-Lending Act.

29.    Said violations, in addition to the fact that Plaintiff's did not properly receive Notices of Right to Cancel, constitute violations of 15 USC sec. 1635(a) and (b) and 12 CFR sec. 226.23(b), and are thus a legal basis for and legally extend Plaintiff's' right to exercise the remedy of rescission.

30.    Defendants assigned or attempted to assign the Note and mortgage to parties who did not take these instruments in good faith or without notice that the instruments were invalid or that Plaintiff's had a claim in recoupment. Pursuant to ORC sec. 1303.32(A)(2)(b)(c) and (f), Defendants are not a holder indue course and is thus liable to Plaintiff's, individually, jointly and severally.

31.    On information and belief and given that the consumer credit transaction was an inter-

temporal transaction with multiple assignments as part of an aggregation and the creation of a REMIC tranche itself a part of a predetermined and identifiable CMO, all Defendants shared in the illegal proceeds of the transaction; conspired with each other to defraud the Plaintiff's out of the proceeds of the loan; acted in concert to wrongfully deprive the Plaintiff's of their residence; acted in concert and conspiracy to essentially steal the Plaintiff's' home and/or convert the Plaintiff's' home without providing Plaintiff's reasonably equivalent value in exchange; and conducted an illegal enterprise within the meaning of the RICO statute.

32.    On information and belief and given the volume of residential loan transactions solicited and processed by the Defendants, the Defendants have engaged in two or more instances of racketeering activity involving different victims but utilizing the same method, means, mode, operation, and enterprise with the same intended result.

# Claims for Relief

## COUNT I: VIOLATIONS OF HOME OWNERSHIP EQUITY PROTECTION ACT

1.    Plaintiff's reaffirm and reallege the above paragraphs 1-72, et al herein above as if set forth more fully herein below.

2.    In 1994, Congress enacted the Home Ownership Equity Protection Act ("HOEPA") which is codified at 15 USC sec. 1639 et seq. with the intention of protecting homeowners

from predatory lending practices targeted at vulnerable consumers. HOEPA requires lenders to make certain defined disclosures and prohibits certain terms from being included in home loans. In the event of noncompliance, HOEPA imposes civil liability for rescission and statutory and actual damages.

3.      Plaintiff's are "consumers" and each Defendant is a "creditor" as defined by HOEPA. In the mortgage loan transaction at issue here, Plaintiff's were required to pay excessive fees, expenses, and costs which exceeded more than 10% of the amount financed.

4.      Pursuant to HOEPA and specifically 15 USC sec. 1639(a)(1), each Defendant is required to make certain disclosures to the Plaintiff's which are to be made conspicuously and in writing no later than three (3) days prior to the closing.

5.      In the transaction at issue, Defendants were required to make the following disclosure to Plaintiff's by no later than three (3) days prior to said closing:

[1].   "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligation under the loan."

6.      Defendants violated HOEPA by numerous acts and material omissions, including but not limited to:

(a) failing to make the foregoing disclosure in a conspicuous fashion;

(b) engaging in a pattern and practice of extending credit to Plaintiff's without

regard to their ability to repay in violation of 15 USC sec. 1639(h).

7.    By virtue of the Defendants' multiple violations of HOEPA, **Plaintiff's have a legal right to rescind the consumer credit transaction** the subject of this action pursuant to 15 USC sec. 1635. This Complaint is to be construed, for these purposes, as formal and public notice of Plaintiff's's Notice of Rescission of the mortgage and note.

8.    Defendants further violated HOEPA by failing to make additional disclosures, including but not limited to Plaintiff's not receiving the required disclosure of the right to rescind the transaction;

9.    The failure of Defendants to provide an accurate TIL disclosure; and the amount financed being understated.

10.    As a direct consequence of and in connection with Plaintiff's' legal and lawful exercise of their right of rescission, the true "lender" is required, within twenty (20) days of this Notice of Rescission, to:

(a) desist from making any claims for finance charges in the transaction;

(b) return all monies paid by Plaintiff's in connection with the transaction to the

Plaintiff's;

(c) satisfy all security interests, including mortgages, which were acquired in the transaction.

11. Upon the true "lenders" full performance of its obligations under HOEPA, Plaintiff's shall tender all sums to which the true lender is entitled.

12. Based on Defendants' HOEPA violations, each of the Defendants is liable to the Plaintiff's for the following, which Plaintiff's demand as relief:

(a) rescission of the mortgage loan transactions;

(b) termination of the mortgage and security interest in the property the subject of the mortgage loan documents created in the transaction;

(c) return of any money or property paid by the Plaintiff's including all payments made in connection with the transactions;

(d) an amount of money equal to twice the finance charge in connection with the transactions; `

(e) relinquishment of the right to retain any proceeds; and

(f) actual damages in an amount to be determined at trial, including attorneys' fees.

# COUNT II: VIOLATIONS OF REAL ESTATE SETTLEMENT

# PROCEDURES ACT

1. Plaintiff's reaffirm and reallege paragraphs 1-72, et al above herein as if specifically set forth more fully hereinbelow.

2. As mortgage lenders, Defendants are subject to the provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 USC sec. 2601 et seq.

3. In violation of 12 USC sec. 2607 and in connection with the mortgage loan to Plaintiff's, Defendants accepted charges for the rendering of real estate services which were in fact charges for other than services actually performed.

4. As a result of the Defendants' violations of RESPA, Defendants are liable to Plaintiff's in an amount equal to three (3) times the amount of charges paid by Plaintiff's for "settlement services" pursuant to 12 USC sec. 2607 (d)(2).

## COUNT III: VIOLATIONS OF FEDERAL TRUTH-IN-LENDING ACT

1. Plaintiff's reaffirm and reallege paragraphs 1-72, et al above herein above as if set forth more fully hereinbelow.

2. Defendants failed to include and disclose certain charges in the finance charge shown

on the TIL statement, which charges were imposed on Plaintiff's incident to the extension of credit to the Plaintiff's and were required to be disclosed pursuant to 15 USC sec. 1605 and Regulation Z sec. 226.4, thus resulting in an improper disclosure of finance charges in violation of 15 USC sec. 1601 et seq., Regulation Z sec. 226.18(d). Such undisclosed charges include a sum identified on the Settlement Statement listing the amount financed which is different from the sum listed on the original Note.

3.      By calculating the annual percentage rate ("APR") based upon improperly calculated and disclosed amounts, Defendants are in violation of 15 USC sec. 1601 et seq., Regulation Z sec. 226.18(c), 18(d), and 22.

4. Defendants' failure to provide the required disclosures provides Plaintiff's with the right to rescind the transaction, and Plaintiff's, through this public Complaint which is intended to be construed, for purposes of this claim, as a formal Notice of Rescission, hereby elect to rescind the transaction.

# COUNT IV: VIOLATION OF FAIR CREDIT REPORTING ACT

1.      Plaintiff's reaffirm and reallege paragraphs 1-72, et al above as if set forth more fully hereinbelow.

2.      At all times material, Defendants qualified as a provider of information to the Credit Reporting Agencies, including but not limited to Experian, Equifax, and TransUnion, under the

Federal Fair Credit Reporting Act. 65. Defendants wrongfully, improperly, and illegally reported negative information as to the Plaintiff's to one or more Credit Reporting Agencies, resulting in Plaintiff's having negative information on their credit reports and the lowering of their FICO scores.

3.    The negative information included but was not limited to an excessive amount of debt into which Plaintiff's was tricked and deceived into signing.

4.    Notwithstanding the above, Plaintiff's has paid each and every payment on time from the time of the loan closing through the present.

5.    Pursuant to 15 USC sec. 1681(s)(2)(b), Plaintiff's are entitled to maintain a private cause of action against Defendants for an award of damages in an amount to be proven at the time of trial for all violations of the Fair Credit Reporting Act which caused actual damages to Plaintiff's, including emotional distress and humiliation.

6.    Plaintiff's are entitled to recover damages from Defendants for negligent non-compliance with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681(o).

7.    Plaintiff's are also entitled to an award of punitive damages against Defendants for their willful noncompliance with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681(n) (a)(2) in an amount to be proven at time of trial.

# COUNT VII: FRAUDULENT MISREPRESENTATION

1. Plaintiff's reaffirm and reallege paragraphs 1-52 above as if set forth more fully hereinbelow.

2. Defendants knowingly and intentionally concealed material information from Plaintiff's which is required by Federal Statutes and Regulations to be disclosed to the Plaintiff's both before and at the closing.

3. Defendants also materially misrepresented material information to the Plaintiff's with full knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

4. Under the circumstances, the material omissions and material misrepresentations of the Defendants were malicious.

5. Plaintiff's, not being an investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender, reasonably relied upon the representations of the Defendants in agreeing to execute the mortgage loan documents.

6. Had Plaintiff's known of the falsity of Defendants' representations, Plaintiff's would not have entered into the transactions the subject of this action.

6.    As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiff's have suffered damages.

# COUNT VIII: BREACH OF FIDUCIARY DUTY

1.    Plaintiff's reaffirm and reallege paragraphs 1-72, et al above as if set forth more fully herein below.

2.    Defendants, by their actions in contracting to provide mortgage loan services and a loan program to Plaintiff's which was not only to be best suited to the Plaintiff's given their income and expenses but by which Plaintiff's would also be able to satisfy their obligations without risk of losing their home, were "fiduciaries" in which Plaintiff's reposed trust and confidence, especially given that Plaintiff's were not and are not investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

3.    Defendants breached their fiduciary duties to the Plaintiff's by fraudulently inducing Plaintiff's to enter into a mortgage transaction which was contrary to the Plaintiff's's stated intentions; contrary to the Plaintiff's's interests; and contrary to the Plaintiff's's preservation of their home.

4.    As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Plaintiff's have suffered damages.

-43-

5.    Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with a callous and reckless disregard for the rights of the Plaintiff's justifying an award of not only actual compensatory but also exemplary punitive damages to serve as a deterrent not only as to future conduct of the named Defendants herein, but also to other persons or entities with similar inclinations.

## COUNT IX: UNJUST ENRICHMENT

1.    Plaintiff's reallege and reaffirm paragraphs 1-71,      above as if set forth more fully herein below;

2.    Defendants had an implied contract with the Plaintiff's to ensure that Plaintiff's understood all fees which would be paid to the Defendants to obtain credit on Plaintiff's' behalf and to not charge any fees which were not related to the settlement of the loan and without full disclosure to Plaintiff's.

3.    Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees. rebates, kickbacks, profits (including but not limited to from resale of mortgages and notes using Plaintiff's's identity, credit score and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme) and gains and YSP fee unrelated to the settlement services provided at closing.

4.    Defendants have been unjustly enriched at the expense of the Plaintiff's, and

maintenance of the enrichment would be contrary to the rules and principles of equity. 97.1. Defendants have also been additionally enriched through the receipt of PAYMENT from third parties including but not limited to investors, insurers, other borrowers, the United States Department of the Treasury, the United States Federal Reserve, et al

5.      Plaintiff's thus demand restitution from the Defendants in the form of actual damages, exemplary damages, and attorneys' fees.

# COUNT X: CIVIL CONSPIRACY

1.      Plaintiff's reaffirm and reallege paragraphs 1-72, et al above as if set forth more fully herein below.

2.   In connection with the application for and consummation of the mortgage loan the subject of this action, Defendants agreed, between and among themselves, to engage in actions and acourse of conduct designed to further an illegal act or accomplish a legal act by unlawful means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiff's.

3.   Defendants agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for themselves at the expense of and detriment to the Plaintiff's.

4. The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiff's.

5. As a direct and proximate result of the actions of the Defendants in combination resulting in fraud and breaches of fiduciary duties, Plaintiff's have suffered damages.

6. Plaintiff's thus demand an award of actual, compensatory, and punitive damages.

## COUNT XI: CIVIL RICO

1. Plaintiff's reaffirm and reallege paragraphs 1-72, et al above as set forth more fully herein below.

2. Defendants are "persons" as defined by ORC sec. 2923.31(G).

3. The conspiracy the subject of this action has existed from date of application to the present, with the injuries and damages resulting therefrom being continuing.

4. Defendants' actions and use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud Plaintiff's constitutes an "enterprise", with the aim and objective of the enterprise being to perpetrate a fraud upon the Plaintiff's through the use of intentional nondisclosure, material misrepresentation, and

creation of fraudulent loan documents.

5. Each of the Defendants is an "enterprise Defendant".

6. As a direct and proximate result of the actions of the Defendants, Plaintiff's have and continue to suffer damages.

# COMPLAINT TO QUIET TITLE TO REAL PROPERTY

1. Plaintiff's reaffirm and reallege paragraphs 1-72, et al above as set forth more fully herein below.

2. Plaintiff's has sent or has caused to be sent authorized Qualified Written Requests to the only known Defendants which the said Defendants have failed and refused to answer despite acknowledging receipt thereof and despite demands from counsel, a copy of which is attached hereto and made a part hereof as specifically as if set forth at length here at.

**SEE EXHIBIT**

3. Plaintiff's has sent or has caused to be sent notice of her intent to rescind the subject loan transaction but has only sent those notices to the only entities that have been disclosed. Hence, without this action, neither the rescission nor the reconveyance which the Plaintiff's is entitled to file (as attorney in fact for the originating lender) and will file contemporaneously with this complaint, gives Plaintiff's full and clear title to the property.

-47-

**SEE EXHIBIT**

4. The real party in interest on the lender side may be the owner of the asset backed security issued by the SPV, the insurer through some claim of equitable interest, or the Federal government through the United States Department of the Treasury or the Federal Reserve. The security is a "securitized" bond deriving its value from the underlying mortgages of which the subject mortgage is one. Thus Plaintiff's is entitled to quiet title against Defendants, clearing title of the purported subject mortgage encumbrance.

5. Plaintiff's is ignorant of the true names and capacities of defendants sued herein as JOHN DOES 1-9 inclusive, and therefore sues these defendants by such fictitious names. Plaintiff's will amend this complaint to allege their true names and capacities when ascertained.

6. Plaintiff's is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

7. Plaintiff's is informed and believes and thereupon alleges that and each of the Defendants claim or might claim an interest in the property adverse to Plaintiff's herein. However, the claim of said Defendants is without any right whatsoever, and said Defendant have no legal or equitable right, claim, or interest in said property.

8.    Plaintiff's therefore seeks a declaration that the title to the subject property is vested in Plaintiff's alone and that the defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property and that said defendants and each of them, be forever enjoined from asserting any estate, right, title or interest in the subject property adverse to Plaintiff's herein.

9.    **WHEREFORE,** in this Count, Plaintiff's humbly asks this Honorable Court will GRANT judgment against defendants and each of them, as follows:

(1)  For an order compelling said Defendant, and each of them, to transfer or release legal title and alleged encumbrances thereon and possession of the subject property to Plaintiff's herein;

(2)  For a declaration and determination that Plaintiff's is the rightful holder of title to the property and that Defendant herein, and each of them, be declared to have no estate, right, title or interest in said property;

(3)  For a judgment forever enjoining said defendants, and each of them, from claiming any estate, right, title or interest in the subject property;

(4)  For costs of suit herein incurred;

(5)  For such other and further relief as the court may deem proper;

# USURY and FRAUD

1.          Plaintiff's reaffirm and reallege the above paragraphs 1-72, et al herein above as if set forth more fully hereinbelow. The subject loan, note, and mortgage was structured so as to create the appearance of a higher value of the real property than the actual fair market value.

2.          Plaintiff's is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

3.          Defendants disguised the transaction to create the appearance of the lender being a properly chartered and registered financial institution authorized to do business and to enter into the subject transaction when in fact the real party in interest was not disclosed to Plaintiff's, as aforesaid, and neither were the various fees, rebates, refunds, kickbacks, profits and gains of the various parties who participated in this unlawful scheme.

4.          Said real party in interest, i.e., the source of funding for the loan and the person to whom the note was transmitted or eventually "assigned" was neither a financial institution nor an entity or person authorized, chartered or registered to do business in this State nor to act as banking, lending or other financial institution anywhere else.

5. As such, this fraudulent scheme, (which was in actuality a plan to trick the Plaintiff's into signing what would become a negotiable security used to sell unregulated securities under fraudulent and changed terms from the original note) was in fact a sham to use Plaintiff's's interest in the real property to collect interest in excess of the legal rate.

6. The transaction involved a loan of money pursuant to a written agreement, and as such, subject to the rate limitation set forth under state and federal law. The "formula rate" referenced in those laws was exceeded by a factor in excess of 10 contrary to the applicable law and contrary to the requirements for disclosure under TILA and HOEPA.

7. Under Applicable New York State law, the interest charged on this usurious mortgage prevents any collection or enforcement of principal or interest of the note, voids any security interest thereon, and entitles the Plaintiff's to recovery of all money or value paid to Defendants, plus treble damages, interest, and attorney fees.

8. Under Applicable New York State Law, Plaintiff's are also entitled and demand a permanent injunction be entered against the Defendants (a) preventing them from taking any action or making any report in furtherance of collection on this alleged debt which was usurious, as aforesaid (b) requiring the records custodian of the county in which the alleged mortgage and other instruments are recorded to remove same from the record, (c) allowing the filing of said order in the office of the clerk of the property records where the subject property, "Loan transaction" and any other documents relating to this transaction are located

and (d) dissolving any lis pendens or notice of pendency relating to the Defendants purported claim.

# RELIEF SOUGHT

**WHEREFORE,** having set forth numerous legally sufficient causes of actions against the Defendants, Plaintiff's asks this HONORABLE COURT for the entry of Final Judgment against all Defendants jointly and severally in an amount not yet quantified but to be proven at trial and such other amounts to be proven at trial, and for costs and attorneys' fees; that the Court find that the transactions the subject of this action are illegal and are deemed void; that the foreclosure which was instituted be deemed and declared illegal and void and that further proceedings in connection with the foreclosure be enjoined; and for any other and further relief which is just and proper.

# DEMAND FOR JURY TRIAL

Plaintiff's demand trial by jury of all matters so triable as a matter of right.

Respectfully submitted,

_V Lach_

Viktor Levchenko, Plaintiff, _Pro Se_

Aleksandr Levchenko, Plaintiff, _Pro Se_

124 Norfolk Street
Brooklyn, New York  11235

**VERIFICATION**

I, _Viktor_ and, _Alexandr Lachma_ are the Plaintiff's in the above-entitled action. I have read the foregoing  and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Brooklyn, New York.

22nd April 2010

_V Lach_

Viktor Levchenko, Plaintiff, _Pro Se_

Aleksandr Levchenko, Plaintiff, _Pro Se_

124 Norfolk Street
Brooklyn, New York  11235

-53-